**IMPERIAL NEWS CO., INC.,**
**Plaintiff–Appellant,**

v.

**P–I–E NATIONWIDE, INC.,**
**Defendant–Appellee.**

**No. 1298, Docket 90–7128.**

United States Court of Appeals,
Second Circuit.

Argued May 3, 1990.

Decided June 5, 1990.

Saul R. Fenchel, Garden City, N.Y. (Karen Strom Owens, Siegel Fenchel & Peddy, Garden City, N.Y., of counsel), for plaintiff-appellant.

Francis R. Matera, New York City (Crowell Rouse & Matera, New York City, of counsel), for defendant-appellee.

Before LUMBARD, FEINBERG and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This case involves a failure to deliver a return shipment of unsold books to a publisher. At issue is a bill of lading that required the shipper to make a claim for a failure to deliver the goods "within nine months after a reasonable time for delivery has elapsed." Because the shipper filed its claim some thirteen months after shipment, we affirm the grant of summary judgment for appellee.

## BACKGROUND

Plaintiff-appellant Imperial News Co., Inc. ("Imperial") is engaged in the business of distributing paperback books and periodicals in the New York metropolitan area. Defendant-appellant P–I–E Nationwide, Inc. ("P–I–E") is a carrier engaged in interstate commerce and licensed by the Interstate Commerce Commission ("ICC").

On April 23, 1987, Imperial as the shipper and P–I–E as the carrier entered into a contract of carriage for the shipment of unsold books from Melville, New York to Fawcett Books, a division of Warner Publisher Services, Inc. ("Warner"), in Dresden, Tennessee. Section 2(b) of the Uniform Straight Bill of Lading, the provisions of which are mandated by the ICC and are

the basis of the contract of carriage at issue, provides in pertinent part:

> As a condition precedent to recovery, claims must be filed in writing....

> Such claims must be filed within nine months after the delivery of the property (or, in the case of export traffic, within nine months after delivery at the port of export), except that claims for failure to make delivery must be filed within nine months after a reasonable time for delivery has elapsed.

Although the books were unsold and shipped as "scrap or waste," the fact of their arrival was important to Imperial because its agreement with Warner allowed it to take a credit against outstanding invoices only for books returned to the publisher, in this case in the amount of $18,999.95. The date of arrival at Warner was not important to Imperial, however, because its longstanding practice was to take an immediate credit upon shipping. Imperial thus took a credit from Warner in April 1987 upon its delivery of the books to P–I–E.

The books in question were lost in transit. In late October 1987, Warner notified Imperial that it was disallowing the credit on the ground that the shipment never arrived in Tennessee. Imperial then made telephone inquiries of P–I–E but received no satisfaction. Finally, on May 20, 1988, Imperial sent a claim of loss to P–I–E, which it received on May 26, roughly thirteen months after the shipment. P–I–E denied the claim on June 7, 1988, on the ground that the claim was not timely filed under Section 2(b) of the bill of lading.

On April 10, 1989, Imperial filed suit against P–I–E in New York Supreme Court, Nassau County. On May 3, P–I–E removed the action to the Eastern District of New York on the ground that it was based on the Carmack Amendment, *see* 49 U.S.C. § 11707 (1982 & Supp. V 1987), to the Interstate Commerce Act, 49 U.S.C. §§ 10101–11917 (1982 & Supp. V 1987). On May 4, P–I–E filed its answer asserting Section 2(b) of the bill of lading as a defense.

P–I–E moved for summary judgment, and the district court granted the motion. 727 F.Supp. 86. Imperial appeals.

## DISCUSSION

The Carmack Amendment to the Interstate Commerce Act provides in pertinent part:

> A carrier or freight forwarder may not provide by rule, contract, or otherwise, a period of less than 9 months for filing a claim against it under this section and a period of less than 2 years for bringing a civil action against it under this section.

49 U.S.C. § 11707(e). ICC regulations require that claims for loss be submitted in writing "within the specified time limits applicable thereto and as otherwise may be required by law." 49 C.F.R. § 1005.2(a) (1989). Consistent with these statutory and regulatory provisions, the bill of lading at issue in the instant matter incorporates the ICC-mandated Uniform Straight Bill of Lading and requires that claims for failure to make delivery "must be filed in writing ... within nine months after a reasonable time for delivery has elapsed." Imperial filed its claim approximately thirteen months after delivery to P–I–E. The principal issue in this case, therefore, is whether four months—or 124 days—is "a reasonable time for delivery."

It is in the interests of all parties to interstate carriage that the provisions of the Interstate Commerce Act and the regulations of the ICC be applied consistently and predictably. So long as the parties to contracts of carriage know in advance what legal rules will be applied in cases of loss, they can adjust their affairs to those rules and provide the most efficient means for reducing that risk. The Supreme Court thus noted almost fifty years ago that

> in respect to many matters concerning which variation in accordance with the exigencies of particular circumstances might be permissible, if only the parties' private interests or equities were involved, rigid adherence to the statutory scheme and standards is required.

*Midstate Horticultural Co. v. Pennsylvania R.R.*, 320 U.S. 356, 361, 64 S.Ct. 128, 130, 88 L.Ed. 96 (1943).

In *Chesapeake & Ohio Ry. v. Martin*, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983 (1931), the Supreme Court, in addressing a bill-of-lading provision very similar to the one at issue here, stated that a reasonable time for delivery is

such time as is necessary conveniently to transport and make delivery of the shipment in the ordinary course of business, in the light of the circumstances and conditions surrounding the transaction.

*Id.* at 213, 51 S.Ct. at 455. The determination to be made, therefore, is what is a reasonable time for transport and delivery, not what is a reasonable time for particular kinds of shippers to learn of non-delivery.

Under this test, Imperial's claim must fail, for 124 days was clearly more than a reasonable time "to transport and make delivery" of the books in question. In considering the summary judgment motion, the district court had before it an affidavit signed by James Riddle, Claims Manager at P–I–E, with supporting documentation, indicating that the "estimated service time between Melville, New York and Dresden, Tennessee is six to seven (6–7) days" and that "the reasonable time for delivery in this case would have been six to seven (6–7) days." The court also had before it an affidavit of a lawyer for P–I–E, also with supporting documentation, indicating that Imperial shipped a similar set of goods through P–I–E from Melville to Dresden one day after the shipment in question and that this second shipment arrived in Dresden only four days after the date of shipment. A reasonable time for delivery was at best a small fraction of the 124 days in issue.

Imperial argues that its internal procedures and its agreement with Warner—in its words, "the economics of this business" —ensured that it could not know that the shipment had not arrived until Warner disallowed the credit, an act that might well occur months after the shipment. Indeed, at oral argument counsel for Imperial indicated that it could take two years to confirm the arrival of the shipment.

We do not quarrel either with counsel's description of Imperial's standard business practices or with his estimates of how long Warner might take to disallow a credit. However, risks arising from business practices of the shipper that cause it to remain in ignorance of a failure of delivery are not allocated to the carrier under the bill of lading in question. That bill of lading reflects the fact that shippers are in the best position to know the extent to which their peculiar business practices will disclose failed deliveries quickly or not and to alter those practices so that shipments will be monitored. Indeed, allocating to carriers risks arising from the business practices of shippers would cause shippers to avoid relatively economical means of ascertaining delivery. For example, Imperial could easily have inquired of Warner as to the arrival of the shipment. Furthermore, allocating those risks to carriers would impose heavy costs upon them by exposing them to unexpected, stale claims. Such a burden would run counter to the purpose of the ICC's Uniform Straight Bill of Lading, which serves to allow carriers to construct a reliable record of potential liabilities, *see Perini–North River Assocs. v. Chesapeake & Ohio Ry.*, 562 F.2d 269, 273 (3d Cir.1977), and to facilitate prompt investigation of claims by carriers, *see Georgia, Fla. & Ala. Ry. v. Blish Milling Co.*, 241 U.S. 190, 195–96, 36 S.Ct. 541, 543–44, 60 L.Ed. 948 (1916).

■ We hold, therefore, that the burden of ascertaining non-delivery rests on the shipper, *see John B. Sanfilippo & Son, Inc. v. Consolidated Rail Corp.*, 659 F.Supp. 990, 995 n. 11 (N.D.Ill.1987), and we reject the claim that the internal practices of shippers, or their commercial relationships with third parties, have a bearing on what is a reasonable time for transport and delivery under Section 2(b) of the Uniform Straight Bill of Lading.

Actually, Imperial knew of the loss by late October 1987, only six months after the date of shipment. Even an unsophisticated shipper—unlike Imperial—would

have known to file a claim of loss at that point. Instead, Imperial was content to place telephone inquiries with P–I–E for an additional seven months before filing its claim of loss.

Imperial asserts that its failure to file a claim resulted from the fact that P–I–E misled it, and that P–I–E is therefore estopped from using Section 2(b) as a shield against liability in this case. The district court held that, even accepting Imperial's factual assertions as true, Imperial had failed to allege facts to warrant application of the estoppel doctrine. We agree with the district court. Estoppel is not to be found lightly, *see Bobst Div. of Bobst Champlain, Inc. v. IML–Freight, Inc.*, 566 F.Supp. 665, 669 (S.D.N.Y.1983), and no compelling circumstances exist here to warrant its application. Imperial claims only that it repeatedly telephoned P–I–E and that P–I–E did not tell it to file a notice of claim. As the district court noted, however, P–I–E had no duty to notify Imperial of its own contractual obligations.

Estoppel cannot be invoked absent evidence that the carrier told the shipper not to file or otherwise led it to believe that filing was unnecessary to have its claim satisfied. *See Foster Wheeler Energy Corp. v. Daily Express, Inc.*, 485 F.Supp. 268, 272 (M.D.Pa.1980); *cf. R.T.A. Corp. v. Consolidated Rail Corp.*, 594 F.Supp. 205, 210–11 (S.D.N.Y.1984) (unreasonable for shipper to infer, from carrier's statements that carrier would reject its claim and that claim had already been rejected, that it need not file a claim). In the instant matter, P–I–E did nothing to mislead Imperial into believing that there was no need to file a notice of its claim. *See Pathway Bellows, Inc. v. Blanchette*, 630 F.2d 900, 905 n. 10 (2d Cir.1980), *cert. denied*, 450 U.S. 915, 101 S.Ct. 1357, 67 L.Ed.2d 340 (1981).

Affirmed.